GERALD F. RAMSLAND vs. JOHN E. SHAW & others
(and a companion case[1]).

Middlesex.     April 4, 1960. — May 5, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, & CUTTER, JJ.

Negligence, Doctor, Nurse. Proximate Cause. Evidence, Matter of con-
jecture, Medical publication, Judicial discretion, On cross-examination,
Collateral inquiry, Repetitious question.

A finding that doctors were negligent in that they administered a spinal
anesthetic to a patient suffering from heart disease was not warranted
on evidence leaving the existence of the heart disease at the time the
anesthetic was administered a matter of conjecture.   [59–61]
Evidence did not warrant a finding that doctors, after administration of a
spinal anesthetic to a patient in a hospital preparatory to a surgical
operation, were negligent in leaving the patient in charge of an experi-
enced "nurse anesthetist" for an interval during which the patient
suffered an injurious cardiac arrest.   [61]
A finding, that doctors and a nurse at a hospital were negligent in that,
after the administration of a spinal anesthetic to a patient preparatory to
a surgical operation, they did not take certain measures to guard against
adverse effects of the anesthetic upon the patient, who suffered a cardiac
arrest a few minutes later, was not warranted in the absence of medical
evidence that sound practice called for such measures.   [61–62]
If there was negligence on the part of a doctor in that, after administering
a spinal anesthetic to a patient at a hospital preparatory to a surgical
operation and establishing anesthesia, he did not ascertain the patient's
blood pressure during a ten minute interval before he turned the patient
over to a "nurse anesthetist," the evidence did not show that such negli-
gence contributed to injury suffered by the patient through a cardiac
arrest occurring suddenly a few minutes after the nurse took charge.
[62–63]
Evidence did not warrant a finding of negligence on the part of an experi-
enced "nurse anesthetist" at a hospital in caring for a patient who suf-
fered injury through a cardiac arrest occurring suddenly a few minutes
after the nurse took charge of him following his anesthetization by a
spinal anesthetic preparatory to a surgical operation.   [63]
At the trial of an action for malpractice, where an English medical treatise
written by an English author shown to be a recognized expert in his field
as practised in England was offered in evidence under G. L. c. 233, § 79C,
there was no abuse of discretion in excluding the treatise on the ground

---

[1] The companion case is by the same plaintiff against Anne McEnaney.

of possible differences between the techniques and procedures in that field used in England and those used in the Massachusetts locality where the alleged malpractice occurred. [64–65]

On cross-examination of a medical witness at the trial of an action for malpractice, there was no abuse of discretion in excluding inquiry into possible causes generally of a drop in blood pressure and cardiac arrest as distinguished from the actual causes of occurrences of that nature involved in the action. [65–66]

No harm appeared in the exclusion on cross-examination of a question already answered in substance by previous testimony of the witness, nor abuse of discretion in excluding on cross-examination a question repetitious of previous questions asked of and answered by the witness. [66]

Two ACTIONS OF TORT. Writs in the Superior Court dated January 4, 1956, and October 26, 1956, respectively.

The actions were tried before *Morton, J.*

*Woodbury F. Howard, (Edward J. Duffy, Jr.,* with him,) for the plaintiff.

*Leon F. Sargent, (John F. Dunn* with him,) for the defendants.

SPALDING, J. These are two actions of tort for malpractice. In one, a physician and two surgeons are defendants, and in the other the defendant is a nurse. Verdicts in favor of all of the defendants were directed. To these rulings and to several rulings on evidence the plaintiff excepted.

The evidence reveals the following. The defendants are Dr. John E. Shaw, an anesthetist, Dr. Lewis S. Pilcher, the senior visiting surgeon at the Newton-Wellesley Hospital in 1954, and Dr. Francis H. Earthrowl who at that time was resident surgeon at that hospital. The defendant Anne McEnaney, a graduate nurse, was employed at the hospital as a "nurse anesthetist."

The plaintiff in April of 1943, when he was about eight years old, was admitted to the Newton-Wellesley Hospital. The provisional diagnosis on admission was "Question [of] acute rheumatic fever." The final diagnosis at the time of the plaintiff's discharge was "Acute rheumatic fever without rheumatic heart disease." Between 1943 and 1954, although the plaintiff returned to the hospital a few times for other ailments and check-ups, he lived an active, normal

life. "In high school he starred on the football team and was on the wrestling, basketball, and baseball teams."

During the evening of November 4, 1954, the plaintiff, then aged twenty and a student at a business college, complained to his mother that he had indigestion and a pain in his side. Early in the morning of November 5, following an examination by his family physician, he was admitted to the Newton-Wellesley Hospital. Upon admission, the defendant Earthrowl and another doctor were of opinion that the plaintiff was suffering from appendicitis and that an appendectomy that morning would be necessary. At that time the plaintiff's mother told Dr. Earthrowl of her son's history of rheumatic fever. Dr. Earthrowl, in accordance with hospital procedure, informed Dr. Pilcher of his diagnosis, and Dr. Pilcher instructed him to "schedule the case tentatively for an appendectomy." At some time prior to 8 A.M. Doctors Pilcher, Earthrowl and Shaw "reviewed the patient's history and physical findings in the hospital record," and discussed the case. This discussion included the question of the proper anesthetic to be used, and a spinal was agreed upon.

At about 7:50 A.M., an appendectomy having been authorized by Dr. Pilcher, a spinal anesthetic was administered by Dr. Shaw, and at 8 A.M. anesthesia had been established in the plaintiff. Prior to anesthesia Dr. Shaw determined the plaintiff's blood pressure but did not record it. He testified that he determined the blood pressure after anesthesia and that it was the same. At 8:10 A.M. Dr. Shaw turned the patient over to the defendant McEnaney (the nurse), informing her that a satisfactory level of anesthesia had been obtained and that he was satisfied with the plaintiff's condition. Thereupon, Dr. Shaw and Dr. Pilcher, who also was present when the anesthetic was administered, left the operating room, the plaintiff thereafter being under the care of McEnaney. Sometime between 8:10 and 8:20 (8:15 according to her testimony) McEnaney took the plaintiff's blood pressure, but "couldn't get any reading"; there was no blood pressure. She administered oxygen under pres-

sure to the plaintiff and informed Dr. Shaw of the absence of blood pressure. He directed her to give the plaintiff an injection of neosynephrine, which she did. Dr. Earthrowl administered an "intravenous infusion." He attempted to ascertain whether the heart was beating, "but didn't hear any heart beat." Upon Dr. Pilcher's arrival in the operating room, he and Dr. Earthrowl decided that the plaintiff's thoracic cavity should be opened for the purpose of massaging the heart. Such an operation was performed by Dr. Earthrowl and as a result the plaintiff's heart action and blood pressure were "restored to a normal level." The appendectomy was then performed.

The results to the plaintiff of the cardiac arrest are not in dispute. Because of it, his brain failed to receive the necessary supply of oxygen and serious damage resulted. The prognosis was that the plaintiff would "have to be cared for as a dependent person as long as he lives."

The plaintiff advanced several theories of negligence on the part of one or more of the defendants, and we shall consider them separately. No contention is made that there was negligence on the part of any of the defendants after the plaintiff's cardiac arrest was discovered.

1. The plaintiff argues that the three defendant doctors were negligent in choosing a spinal anesthetic. There is no evidence that this choice was bad medical practice in and of itself, and the plaintiff does not so contend. See *Semerjian* v. *Stetson*, 284 Mass. 510, 513. Rather the plaintiff bases his claim of negligence on the fact that at the time of the operation he was suffering from heart disease, and on certain medical testimony and excerpts from a medical treatise.[1] But we are of opinion that the jury would not have been warranted in finding that the plaintiff had a heart disease at the time of the operation. Upon the plaintiff's discharge from the hospital after his attack of rheumatic

[1] Dr. Shaw testified that "[c]oronary disease is a relative contra-indication to spinal anesthesia." In a medical treatise by Dr. Paul Dudley White which was put in evidence it was stated, "General anesthesia, with ether or ethylene and oxygen, and local anesthesia are the procedures of choice from the cardio-vascular standpoint."

fever, the final diagnosis, as above stated, was "Acute rheumatic fever without rheumatic heart disease." In 1951 the plaintiff entered the hospital for a heart examination and the diagnosis was "no heart disease." Added to this was the evidence that the plaintiff had for years participated in vigorous athletic competition and at the time of the admission under consideration was playing "semi-pro" football. There are, to be sure, other entries in the 1943 hospital report to be considered. These are: "question [of] transient systolic murmur (brought out after exercise)"; and "suggestion of some enlargement of the left auricle posteriorly. The possibility of a mitral lesion is suggested." The hospital record in 1944 contains the following: "There [is] a question [of] soft mitral systolic murmur not transmitted. No diastolic murmur, no thrill." And a hospital record made in 1945 states that "[the] possibility of a mitral lesion is suggested."

The medical testimony with respect to the above entries came from Dr. Pilcher who stated that "transient systolic murmur (brought out after exercise)" is quite common in a heart that is not diseased, although not characteristic of a normal heart; and that the entry "question [of] soft mitral systolic murmur" indicated that the person examining the plaintiff was not able to tell whether or not the plaintiff's valve between the left auricle and left ventricle was in normal condition. Concerning the 1945 record, Dr. Pilcher stated that the examining physician was raising the "possibility" of rheumatic heart disease, and that "[a] lesion in the area of the mitral valve during a history of rheumatic fever is an indication that complications of the disease have reached the heart."

The following excerpts from a treatise ("Heart Disease") by Dr. Paul Dudley White were introduced: "It is probable that in every case of rheumatic infection there is some heart disease, however slight or transient, and that in a certain percentage of the total number there is complete recovery with return to normal . . . ." "Still another type of coronary disease, and one that is relatively infrequent, is

that due to rheumatic . . . infection." See G. L. c. 233, § 79C.

Viewing the foregoing evidence, as we must, most favorably to the plaintiff, we are of opinion that it leaves the question of the plaintiff's heart disease at the time of the operation in the realm of conjecture. The issue involved matters of a highly technical nature and to have submitted it to the jury on the foregoing evidence would have invited them to indulge in sheer speculation. The plaintiff's case is not improved by his mother's testimony that in 1943 the plaintiff had a "rheumatic fever heart condition." Her testimony on a subject of this sort could not take the place of expert testimony. See *Berardi* v. *Menicks,* 340 Mass. 396, 401. Moreover, she also testified that on November 4, 1954, when the plaintiff was stricken with appendicitis the plaintiff "was apparently in perfect health."

2. The plaintiff contends that Doctors Pilcher, Earthrowl and Shaw were negligent in entrusting certain supervisory duties to the defendant McEnaney. More specifically, the plaintiff argues that the defendant doctors could have been found to be negligent in entrusting the plaintiff to the care of McEnaney during the thirty minute period after the spinal anesthetic had been administered, as that is the most dangerous time, that is, the time when a sharp drop in blood pressure can be expected. The duty of the defendant doctors in this respect is determined by the skill and care which members of their profession commonly possess and exercise in the locality where they practise. *Semerjian* v. *Stetson,* 284 Mass. 510. *Berardi* v. *Menicks,* 340 Mass. 396, 400. And the burden is on the plaintiff to show that the defendants departed from this duty. McEnaney was a nurse with twenty years' experience in the field of anesthesia. There is no testimony to show that the conduct of the defendant doctors, in entrusting the plaintiff to a nurse with McEnaney's experience, after anesthesia had been obtained, was a departure from the accepted procedure then obtaining in the Newton-Wellesley locality.

3. The plaintiff further contends that all of the defend-

ants were negligent in failing to administer oxygen or an intravenous infusion, or both, prior to the cardiac arrest in order to guard against some of the foreseeable effects of a spinal anesthetic. The evidence shows that neither of these was administered prior to the cardiac arrest, but there was no evidence either from experts or from treatises that sound medical practice called for this procedure. Lacking such evidence, the jury would not be warranted in finding negligence. *Berardi* v. *Menicks,* 340 Mass. 396, 401, and cases cited.

4. The plaintiff argues that all of the defendants were negligent in failing to determine and record, prior to the cardiac arrest, the plaintiff's blood pressure, pulse and respiration at five minute intervals. As to the defendants Pilcher and Earthrowl, there is no evidence that, as surgeons, they had any duty to make these determinations and recordings. Dr. Shaw testified that it was good practice to record blood pressure at five minute intervals. He also testified that after anesthesia had been established he ascertained and recorded the plaintiff's blood pressure and noted that it was the same as that obtained by him prior to anesthesia. We construe Dr. Shaw's testimony, together with the fact that no blood pressure readings were recorded on the anesthesia record between 8 and 8:10, as indicating that he did not take any readings between 8 and 8:10. If we assume that there was negligence in failing to obtain a blood pressure reading between 8 and 8:10 the evidence fails to show that such failure contributed to the plaintiff's injuries. Dr. Shaw testified that when he turned the plaintiff over to the nurse at 8:10 "he was satisfied with the condition of the patient." While what is meant by a satisfactory condition is not further explained, it is reasonable to infer that at least it meant that the plaintiff's heart was functioning satisfactorily. Such medical evidence as there was on the subject showed that a cardiac arrest generally occurs very suddenly and without any warning. Even if Dr. Shaw's testimony as to the plaintiff's condition at 8:10 is disbelieved, there is a lack of affirmative evidence war-

ranting the finding that the plaintiff's condition was not satisfactory at that time. If, as we have indicated above, Dr. Shaw could not be found to be negligent in entrusting the plaintiff to McEnaney's care, he could not be held responsible for her negligence, if any there was, after she took charge. *Guell* v. *Tenney,* 262 Mass. 54. *Klucken* v. *Levi,* 293 Mass. 545, 551.

5. We are of opinion that a finding of negligence on the part of McEnaney was not warranted. She testified that it would be normal practice "to take and record blood pressure readings at five minute intervals." When she was placed in charge of the plaintiff at 8:10 A.M. she was told by Dr. Shaw that the plaintiff's condition was satisfactory. See *Shannon* v. *Ramsey,* 288 Mass. 543, 551. She testified that she obtained a blood pressure reading at approximately 8:15 A.M. While this evidence could be disbelieved, such disbelief would not establish the contrary; nor was there any evidence to the contrary.

6. Some questions of evidence remain. The plaintiff excepted to the exclusion of a question to one Downey, city librarian of Lowell, which occurred in these circumstances. The plaintiff desired to put in evidence an excerpt from a medical treatise by Dr. R. R. MacIntosh entitled "Lumbar Puncture and Spinal Analgesia." Before this could be done the plaintiff had to satisfy the judge that the author was "recognized in his profession or calling as an expert on the subject." G. L. c. 233, § 79C. Downey, in response to a question by the plaintiff's counsel, stated that he had with him a book from the Lowell library entitled "Who's Who," 1957. Downey was then asked, "Is . . . [this book] consulted by any person or persons engaged in any occupation?" This question was excluded, subject to the plaintiff's exception. The plaintiff offered to prove through Downey that "Who's Who," 1957 edition, "contains facts of general interest to librarians; that it is issued to the public; that the book is published for the use of librarians; and that it is commonly used and relied upon by librarians as a book of reference; and that said book contains . . .

biographical facts [concerning Dr. R. R. MacIntosh]."
The excerpt from "Who's Who" about Dr. MacIntosh,
which need not be recited, was then made part of the offer
of proof. Such evidence, of course, would not be admissible at common law. *National Bank of Commerce* v. *New
Bedford,* 175 Mass. 257, 261. Its admissibility must be
found in G. L. c. 233, § 79B.[1] But for reasons presently
appearing it is not necessary to decide whether the excluded
evidence ought to have been admitted. Much later in the
trial the plaintiff recalled Dr. Shaw and sought to show
through him that Dr. MacIntosh was a recognized expert in
the field of anesthesia. After Dr. Shaw had given evidence
which would have warranted a finding that Dr. MacIntosh
was a recognized authority in this field, the plaintiff offered
an excerpt from his book "Lumbar Puncture and Spinal
Analgesia." This was excluded subject to the plaintiff's
exception. We lay to one side the fact that the record
contains no offer of proof concerning the excluded excerpt.
See *Nicholas* v. *Lewis Furniture Co.* 292 Mass. 500, 504.
Compare *Newton Girl Scout Council, Inc.* v. *Massachusetts
Turnpike Authy.* 335 Mass. 189, 199. It is apparent that
the judge excluded the excerpt in the exercise of his discretion, for he so stated. The statute (G. L. c. 233, § 79C)
provides that, subject to certain requirements, medical treatises "in the discretion of the court" are admissible in malpractice cases. We cannot say that the judge abused his
discretion in excluding the excerpt from Dr. MacIntosh's
treatise. This treatise was published in England and was
written by an English author. It is apparent from the colloquy between counsel for the plaintiff and the judge at the
time the treatise was offered that the judge in exercising
his discretion was influenced by the fact that there might be
differences between the anesthesia procedures and techni-

[1] "Statements of facts of general interest to persons engaged in an occupation
contained in a list, register, periodical, book or other compilation, issued to the
public, shall, in the discretion of the court, if the court finds that the compilation is published for the use of persons engaged in that occupation and commonly is used and relied upon by them, be admissible in civil cases as evidence
of the truth of any fact so stated."

ques obtaining in England and those obtaining here. The defendants' conduct, of course, must be tested by the standards of care and skill prevailing in the community where they practised. Thus, even if we assume, arguendo, that the "Who's Who" evidence ought to have been admitted, that would have established no more than that Dr. MacIntosh was a recognized expert in the field of anesthesia as it is practised in England. This would not have cured the infirmity in the evidence which was the basis for the judge's ruling, namely, the possible differences in anesthesia techniques in England and the locality here involved.

During the cross-examination of Dr. Pilcher, the plaintiff's counsel asked, "But so far as this particular case is concerned, what other factors are there that have a significance in the drop of blood pressure?" Dr. Pilcher's answer was, "I don't know what the factors were that caused the fall in blood pressure in this case—and I don't believe anybody knows—but I can discuss with you the factors which may cause fall in blood pressure in a case of this type. Is that what you want me to do?" The judge of his own motion refused to allow further inquiry along this line and the plaintiff excepted. There was no error. Dr. Pilcher had answered the question in the negative. He then volunteered a suggested line of inquiry as to possible causes for drop in blood pressure in cases of the sort under consideration. This was not responsive to the question put to him and the judge in his discretion could very well have concluded that it would carry the inquiry too far afield. The real question in issue was what caused the drop in the plaintiff's blood pressure and not what are the causes generally.

Dr. Pilcher testified on cross-examination that the beating of the heart depends upon the condition and soundness of the nerves which actuate the heart muscle, and the condition and soundness of the muscle itself, and "other things beside those things." He was then asked, "And what other conditions are there that determine whether the heart continues beating or not in addition to the condition of the

nerves which actuate the muscle of the heart?'' The judge said, ''I will exclude any answer to that question now,'' and the plaintiff excepted. Later the witness was asked, ''Do you know of anything else in this case other than conditions as they affect the nerves that actuate the muscle of the heart, or the muscle itself, that could explain the cardiac arrest?'' The answer was, ''I do not know of any cause.'' It is to be noted that the first question related to the general causes of cardiac arrest, whereas the second one asked for causes in the present case. For the reasons discussed with respect to the previous exception, we think that the judge did not unduly limit the cross-examination. *Davis* v. *Hotels Statler Co. Inc.* 327 Mass. 28, 30, and cases cited.

Dr. Pilcher was asked on cross-examination, ''Doctor, if the administration of oxygen would be of assistance, in view of the sharp drop in blood pressure and respiratory trouble that had arisen, to counteract those, why wouldn't it have been of assistance in preventing it?'' To the exclusion of this question the plaintiff excepted. A few questions earlier Dr. Pilcher had testified that it would not have been proper to administer oxygen before the drop in blood pressure occurred and that ''over-oxygenating'' a patient could be harmful. In view of this answer it is difficult to see how the plaintiff was harmed, for in substance his question had already been answered.

The exception to the question put to Dr. Earthrowl on cross-examination is without merit. The question was, ''When you [approved of the inhalation of oxygen] . . . you assumed, didn't you, that one of the reasons why the heart stopped beating was because it wasn't having sufficient oxygen, isn't that so?'' Prior to this question several questions dealing with the same subject matter had been put to the doctor and the doctor's answer to each of them was that he did not know why the heart had stopped beating. The judge, in his discretion, could properly have excluded the question as repetitious.

*Exceptions overruled.*