RICHARD A. CAMPBELL, administrator, *vs.* CLARENCE E. THORNTON & another.

Essex.    February 6, 1975. — August 26, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Negligence,* Doctor. *Doctor. Evidence,* Opinion: expert.

At the trial of an action for malpractice to recover for the death of a child placed in the "fog room" of a hospital to relieve her respiratory difficulties and who fell out of her crib, after its side rails had been lowered and her parents had left her unattended without notifying a nearby nurse of their departure, and was strangled by a restraining jacket tied to the crib by the child's mother, evidence did not permit a finding that the accident was a reasonably foreseeable one for which the defendant chief of the medical staff of the hospital was liable [535-536]; nor did the evidence permit a

finding of negligence on the part of the defendant general medical practitioner in whose care the child was in that he did not advise her parents to engage a special nurse to be "in constant attendance" while the child was in the fog room [536-538].

At the trial of an action for malpractice against a general medical practitioner to recover for the death of a child in his care who fell out of her crib at the "fog room" of a hospital in which she had been placed to relieve her respiratory difficulties, there was no error in excluding hypothetical questions to the medical examiner "whether good and accepted medical practice would have required a special nurse" to attend the child where the witness himself repeatedly indicated that he lacked knowledge of relevant prevailing medical standards. [539-541]

TORT. Writ in the Superior Court dated January 16, 1967.

The action was tried before *Bennett, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*John J. Murphy* for the plaintiff.

*Lionel H. Perlo (Jacob J. Locke* with him) for the defendants.

QUIRICO, J. This is an appeal by the plaintiff from the following rulings and orders of a judge of the Superior Court in the course of the trial of an action of tort for alleged medical malpractice and other negligence causing the conscious suffering and death of the plaintiff's intestate: (a) orders directing the jury to return verdicts in favor of the defendants on counts 5 and 6 against Dr. Clarence E. Thornton and counts 9 and 10 against Dr. Nathaniel A. MacDonald, and (b) rulings excluding certain evidence offered by the plaintiff. The appeal before us involves only the four counts identified above.[1] We conclude that there was no error.

---

[1] The plaintiff's declaration included thirty-two counts in addition to the four involved in this appeal. Counts 7 and 8 against Dr. Thornton were disposed of by directed verdicts in his favor and the plaintiff has perfected no appeal therefrom. The remaining thirty counts which ran against defendants other than Drs. Thornton and

The plaintiff originally sought appellate review by way of a bill of exceptions filed on February 8, 1973. The bill had not been acted on by the judge by July 1, 1974, when the new Massachusetts Rules of Appellate Procedure took effect. Massachusetts Rule of Appellate Procedure 1A, 365 Mass. 845 (1974), provides in part: "(7). Any bill of exceptions timely presented to the trial justice but not yet allowed by July 1, [, 1974,] will be treated as a timely notice of appeal (see Appellate Rule 4) filed by July 1, and further appellate proceedings shall conform to the Massachusetts Rules of Appellate Procedure." The appeal was originally entered in the Appeals Court and was then transferred to this court under the provisions of G. L. c. 211A, § 10(A), inserted by St. 1972, c. 740, § 1.

This case arises out of the death on January 23, 1966, of the plaintiff's intestate, Martha Campbell (Martha); a child of two years and eight months old, at the Hunt Memorial Hospital (hospital) where she was a patient under the care of Dr. Thornton. At that time Dr. MacDonald was the chief of the medical staff at the hospital. The plaintiff seeks to recover from Dr. Thornton in count 5 for the death of Martha, and in count 6 for her conscious suffering; and he seeks similar recovery from Dr. MacDonald in counts 9 and 10. The two counts against Dr. Thornton are based on "the carelessness and negligence of the defendant . . . in the care of the plaintiff's intestate, and in the maintenance, design, repair and supervision of the premises of the said hospital and hospital equipment and appurtenances," and alleged that the defendant had undertaken "to faithfully, skillfully and diligently practice medicine on the plaintiff's intestate." The two counts against Dr. MacDonald do not allege that he had undertaken to treat the plaintiff's intestate,

MacDonald have all been disposed of by waivers by the plaintiff, by directed verdicts for the defendants, or otherwise; and there are no appeals arising therefrom.

otherwise they are the same as the counts against Dr. Thornton. Each defendant filed an answer consisting of a general denial and a claim that the plaintiff was guilty of contributory negligence.

Before moving to the several legal issues raised by this appeal, we summarize certain facts about which there appears to be little or no material disagreement. On the morning of Friday, January 21, 1966, Martha seemed to have a cold. Her mother (Mrs. Campbell) called Dr. Thornton who advised that she put Martha "in steam for the day." Dr. Thornton is a general practitioner in Danvers, and in the course of his general practice he treats children. Later that day Martha seemed much worse and Mrs. Campbell brought her to the doctor's office. The doctor prescribed penicillin and again advised that Martha be kept in a steam room. Martha's parents followed the doctor's advice but Martha was unable to take or hold her medication. Late in the evening of Saturday, January 22, 1966, as the result of a call from Mrs. Campbell, the doctor had Martha admitted to the hospital.

Dr. Thornton was present when Martha was admitted and placed in a "fog room" located in the pediatric section of the hospital. She was placed in the crib in that room to relieve her respiratory difficulties. The crib was equipped with side rails which could be moved up or down. When Martha was placed in the crib she was dressed in a garment (jacket) provided by the hospital to be tied to the crib for the purpose of restraining her movement. The sides of the crib were then raised, and they remained in that position when Martha's parents left the room to return home. The hospital's "Pediatric Procedures" then in effect included a provision stating that "Bedsides on cribs of all children under 5 yrs. of age must be up and securely fastened at all times — unless someone is actually with the child."

Martha's parents visited her on the afternoon of the following day, Sunday, January 23, 1966. When they

arrived about 2 P.M. the bedsides on the crib were in a raised position and the strings of the restraining jacket were tied to the crib with the result that Martha could sit up but could not stand up, and could move very little from side to side. A nurse lowered one bedside all the way down. This was done at Mrs. Campbell's request to enable her to hold Martha. Mr. Campbell lowered the other bedside about halfway down. A nurse untied the strings of the restraining jacket. As the end of visiting hours (4 P.M.) approached, a nurse entered Martha's room to take her temperature and render her some other service. The restraining jacket strings were not then tied to the crib. The bedsides were as described above, one down and the other partially down. They remained that way when the parents left the room to return home, but before leaving Mrs. Campbell tied the strings of the restraining jacket to the crib. During her visit with Martha, Mrs. Campbell sat near the crib where the bedside had been lowered all the way. When she left the room to go home, she knew the bedside was down, but she did not raise it. Neither did she mention the fact or make any other statement to a nurse whom she saw across the corridor as she was leaving Martha's room. Martha was unattended when her mother left the room.

The nurse, who had not seen the parents leave, next went to Martha's room at 4:25 P.M. and found her hanging over the edge of the crib where the side was in a lowered position. Martha was held by the restraining jacket, with her feet not touching the floor. Her whole body was off the crib with her back against the lowered crib side, her arms over her head, and her head to one side. The jacket was at her neck and under her arms, but not over her head. Two strings from the jacket were still tied to the spring of the crib under the mattress. The nurse picked Martha up and put her on the bed and mouth to mouth respiration was tried without success. Martha was dead. The medical examiner, Dr. Dougald C. MacGillivray, was called and arrived at the hospital

about 4:45 P.M. He caused an autopsy to be performed and the cause of death was determined to be "asphyxiation by strangulation." The nearest nurse's station was about fifteen feet distant from the outer door to the fog room. The outer door was a solid door which opened from the outside into a hall about ten feet in length and five feet in width. At the end of this hall was an inner door leading directly into the fog room. The inner door had a narrow window extending from about the middle level to the top of the door. A person standing at that door could look through the window and see Martha's crib. A nurse at the nearest nurse's station could not see into the fog room.

Like Dr. Thornton, Dr. MacDonald practiced in Danvers, specializing in internal medicine. He was connected with the hospital as chief of internal medicine from 1955 to 1961, and he had been chief of the medical staff from 1961 through the date of Martha's death. The duties of the chief of the medical staff, prescribed by the portion of the by-laws of the medical staff quoted in the margin of this opinion,[2] include the duty "[t]o concern

---

[2] "2. The duties of the Chief of Staff shall be:

a. A thorough acquaintance with the qualifications, abilities, and privileges of all physicians working in the hospital.

b. To interview and evaluate the qualifications of physicians seeking staff appointments.

c. To arbitrate all disputes involving the Medical Staff.

d. To appoint members of all standing committees unless otherwise specified by these By-laws.

e. To act as an Ex-officio member of all Staff Committees.

f. To act as Chairman of the Executive Committee.

g. To attend meetings of the Board of Trustees.

h. To concern himself with the overall quality of the patient care in the hospital.

i. To fulfill the duties of the President of the Staff in his absence."

himself with the overall quality of the patient care in the hospital."

Dr. MacDonald knew that on January 23, 1966, and for some time prior thereto, the hospital had a set of rules and regulations entitled "Pediatric Procedures" governing the admission, care and treatment of children under seventeen years of age in the hospital. He did not acquaint himself with those rules and regulations, delegating this matter to the chief of pediatrics at the hospital.

The fog room was in a wing which had been added to the hospital about one and one-half years before Martha's death, while Dr. MacDonald was the chief of the medical staff. The doctor had seen the plans for the new wing, but he had no function or authority with respect to the design of the wing. There was a building committee for the new wing, but the doctor was not a member of that committee. He had been in the new wing about five times a week after it was built, and knew of the location of the fog room in question.

The by-laws of the hospital provided that "The Board of Trustees under the general direction and supervision of the Town Manager shall manage and conduct all business of the hospital relating to its management . . . including recommending the appointments of the Administrator and personnel." Dr. MacDonald, the chief of the medical staff, did not personally hire or fire any nurses or other hospital personnel. The "By-laws of the Medical Staff" provide that the chief of each of the services (clinical, surgery, medicine, obstetrics, and pediatrics) "shall have the responsibility for . . . [t]he supervision of the care of patients in his service."

Neither Mr. nor Mrs. Campbell ever requested Dr. MacDonald to examine or treat their daughter Martha, nor did either of them see the doctor do so. There was no evidence that the doctor ever did examine or treat Martha.

A. Directed Verdicts for Defendants.

With regard to the judge's orders allowing the motions of Drs. Thornton and MacDonald for directed verdicts in their favor, the issue as to each defendant is whether there was any evidence which would have permitted a jury to find that the doctor was negligent and that his negligence caused or contributed to the death of Martha. "The issue was for the jury, if anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff. If any such combination of circumstances could be found it is, for present purposes, immaterial how many other combinations could have been found which would have led to conclusions adverse to the plaintiff. And in determining what circumstances could be found the plaintiff is entitled to the benefit of all the evidence most favorable to him, even though his own testimony may have been less favorable." *Kelly* v. *Railway Exp. Agency, Inc.* 315 Mass. 301, 302 (1943), and cases cited therein. *Howes* v. *Kelman*, 326 Mass. 696, 696-697 (1951), and cases cited therein. We now apply that test to the evidence as to each defendant.

1. *Defendant Dr. MacDonald.* There is no allegation or evidence that Dr. MacDonald was ever asked or requested, or that he ever undertook to examine, care for or treat Martha. The claim against Dr. MacDonald is predicated solely on the fact that from the time the hospital wing which included the fog room was built until the time Martha was a patient in that room the doctor was the chief of the hospital's medical staff. This alone is not sufficient to impose liability on him for the negligence, if any, of other doctors or of agents, servants or employees of the hospital, either in the treatment of patients or in the design of the hospital wing which contained the fog room. His position as chief of the medical staff would not, without more, make Dr. MacDonald liable

under the doctrine of respondeat superior for the negligence, if any, of such other persons or doctors. *Withington* v. *Jennings*, 253 Mass. 484, 486 (1925). *Klucken* v. *Levi*, 293 Mass. 545, 551 (1936). *Ramsland* v. *Shaw*, 341 Mass. 56, 63 (1960). *Barrette* v. *Hight*, 353 Mass. 268, 272 (1967). The evidence does not permit a holding that the accident which took Martha's life was reasonably foreseeable by Dr. MacDonald by reason of his position as chief of the medical staff. The plaintiff does not contend that Dr. MacDonald negligently selected or permitted any unqualified or incompetent doctors, nurses, or other persons to practice or work at the hospital.

The judge correctly directed the jury to return verdicts in favor of Dr. MacDonald on counts 9 and 10.

2. *Defendant Dr. Thornton.* Our conclusion above that Dr. MacDonald cannot be held liable for the negligence, if any, of other doctors or of agents, servants, or employees of the hospital applies equally to Dr. Thornton. There is no evidence that such other persons were in any sense agents, servants, or employees of Dr. Thornton, that he had any control over their actions or conduct, or that he acted jointly or in concert with them. Therefore, the decision on the question whether the evidence was sufficient to permit the jury to find him negligent must be made solely on consideration of the evidence of what he personally did or failed to do.

Dr. Thornton undertook, as a general practitioner, to treat Martha. The standard of care and skill to be exercised by him in that situation is governed by the following language in *Brune* v. *Belinkoff*, 354 Mass. 102, 109 (1968): "The proper standard is whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession. In applying this standard it is permissible to consider the medical resources available to the physician as *one* circumstance in determining the skill and care

required.   Under this standard some allowance is thus
made for the type of community in which the physician
carries on his practice.   See Prosser, Torts (3d ed.) § 32
(pp. 166-167) [1964]; compare Restatement 2d: Torts,
§ 299A, comment g [1965]."

It is important to note at this point that the basis of
the plaintiff's claim against Dr. Thornton is not that the
doctor negligently diagnosed or treated Martha's illness.
Rather the basis of the claim, as stated in the plaintiff's
brief, is "that the defendant Dr. Thornton failed to
exercise reasonable care for the safety of his minor patient
Martha Campbell in that, under the circumstances
existing on January 22 and 23, 1966, he should have
ordered a special nurse to be in constant attendance
while the deceased was confined in the fog room at the
Hunt Memorial Hospital."   The consideration of this
claim requires us to summarize some additional evidence
relating specifically thereto.

When Martha was being admitted to the hospital, her
parents were concerned about the care she would receive
as a patient in the fog room.   The parents testified that
Dr. Thornton told them Martha would be checked every
few minutes.   The doctor testified that medically speak-
ing he "had never been concerned about the nursing
care," that he "had always been satisfied with it," and
that "medically speaking if . . . [the nurses] saw this
patient approximately every half hour it would be
adequate."   Mrs. Campbell asked whether she should
stay with Martha the night she was admitted to the
hospital and the doctor advised her that it was not
necessary.   Mrs. Campbell also asked whether Martha
should have a special nurse.   The doctor advised that
Martha was not critically ill, and that if she became
critically ill, and a special nurse were required, he would
order one.   He gave no instructions that an attendant or
special nurse be retained for Martha because he did not
consider it medically necessary.   No instructions were

given to Mrs. Campbell concerning the lowering or raising of the crib's bedsides, or in regard to reporting to anyone when she left Martha's room. The nursing procedure in effect at that time was that the nurse would check a patient in the fog room every half hour, and that she would check the other patients in the pediatric ward every hour. Other patients of the same general age as Martha had been admitted to the fog room without the services of a special nurse prior to Martha's admission. Some were patients of Dr. Thornton and some were patients of other doctors. During the period that the fog room was in existence prior to Martha's admission, none of these young patients of Dr. Thornton had sustained any accidents in that room.

The plaintiff contends that on all the evidence, considered in its light most favorable to him, the jury could infer that Dr. Thornton was negligent in failing to advise Martha's parents to engage a special nurse for her while she was in the fog room. We do not agree. The test is whether injury to Martha "was reasonably to be apprehended" as the result of Dr. Thornton's failure to order that she be attended by a special nurse while she was in the fog room. *Marangian* v. *Apelian,* 286 Mass. 429, 436 (1934). We hold that it was not. The evidence does not permit a holding that it was reasonably foreseeable by the average general practitioner that while Martha was tied to her crib with a restraining jacket someone would lower the bedsides on the crib and then go away leaving her unattended. In particular, the evidence does not permit a holding that it was foreseeable that her own parents would do so. Our conclusion is that there is no evidence, whether from medical witnesses or otherwise, which, considered in its light most favorable to the plaintiff, would have permitted the jury to infer that Dr. Thornton was negligent. See *Tallon* v. *Spellman,* 302 Mass. 179, 182-183 (1939); *Haggerty* v. *McCarthy,* 344 Mass. 136, 139-142 (1962).

B. Rulings Excluding Evidence Offered by Plaintiff.

The plaintiff called as his witness Dr. Dougald C. Mac-Gillivray, who is engaged in the practice of general surgery in Danvers. From 1963 to 1970 he was the medical examiner for Essex County, district eight, which includes the town of Danvers. G. L. c. 38, § 1. He has been a member of the medical staff of the hospital since 1958. After questioning the doctor about his professional education, training and experience, about what he saw and did at the hospital when called there by reason of Martha's death, and about the location and physical description of the fog room, with particular reference to visibility into the room from the corridor, counsel for the plaintiff put a series of hypothetical questions to him generally aimed at obtaining his opinion "based upon a reasonable degree of medical certainty as to whether good and accepted medical practice would have required a special nurse for Martha Campbell." The question, with variations and refinements, was objected to in all its forms for a variety of reasons. A principal ground of objection was that the doctor was not qualified to give an opinion of the standard of care of a general practitioner in a case such as this. This inevitably led to the excusing of the jury and the holding of a lengthy voir dire.

At some points during the voir dire examination of the doctor he appeared to be saying that he had an opinion which was within the scope of the inquiry and limited to "the degree of care and skill of the average qualified [general] practitioner, taking into account the advances in the profession," in the sense in which that language was used in *Brune* v. *Belinkoff,* 354 Mass. 102, 109 (1968). At other points he appeared to be saying that he either had no opinion ("I can't speak for standards of general practitioners because they would vary as to every single general practitioner."); or that he was unwilling to express an opinion ("I know of no place where it says

when there should be a special nurse in a given situation. And I think it is unfair for a physician six years later who didn't see the child on that particular day and the circumstances surrounding the case on that particular day to make, to give an opinion that is so important on either side of this case, your Honor."). The doctor's ambivalence may have been due to the fact that he does not appear to have offered himself as an expert witness in the plaintiff's behalf, but rather seems to have been called as a witness only because of his connection with the case as the medical examiner.

Toward the end of the voir dire Dr. MacGillivray agreed that he had testified at the inquest held with respect to Martha's death and had there stated: "In all fairness to the setup on this particular night it was the doctor's opinion and there seems to be good evidence to support it, that this child from the point of view of his respiratory difficulty was not sick enough to warrant the type of observation, so from the point of view of the disease a special nursing and observation wasn't indicated." That was followed quite closely by statements by the doctor in the voir dire hearing, reproduced in the margin of this opinion, to the effect that he had little or no personal knowledge of the standards followed by general practitioners or pediatricians, and that he was not prepared to give an opinion as to medical standards applying to Dr. Thornton on January 23, 1966, with regard to the necessity for observation of his patient, Martha Campbell.[3] Thereupon the judge ruled that "the

---

[3] The following are pertinent excerpts from the transcript of the voir dire hearing: Q. "Now, the question is: Did you know or do you know now what the general practice was prior to January 23, 1966, with respect to children of this age and with this degree of a problem that faced the doctor who was taking care of the child?" A. "No, I don't know except in a very general way." Q. "Because, Doctor, that wasn't your field, was it?" A. "That's correct." Q. "So basically, the basis of your opinion testimony is really what you personally feel the situation should have been . . . rather than any

doctor is not prepared to state an opinion on that subject."

The judge's exclusion of the opinions of Dr. MacGillivray was not error. "It is settled that whether a witness offered as an expert is qualified to give an opinion, rests very largely in the discretion of the presiding judge whose decision will not be reversed unless clearly erroneous as matter of law." *Johnson* v. *Lowell,* 240 Mass. 546, 549 (1922). *Guinan* v. *Boston Elev. Ry.* 267 Mass. 526, 527 (1929). A judge's exclusion of opinion evidence because of the inadequacy of the witness's qualifications will not be reversed except in rare instances where, as matter of law, the exclusion of the proffered evidence would be an abuse of discretion and therefore unwarranted. *Corrao* v. *Sears, Roebuck & Co.* 298 Mass. 23, 26 (1937). *Carbonneau* v. *Lachance,* 307 Mass. 153, 155 (1940). *Langis* v. *Danforth,* 308 Mass. 508, 510-511 (1941). *DeJesus* v. *Hamel,* 349 Mass. 764 (1965). McCormick, Evidence, § 13 (2d ed. 1972). There is no abuse of discretion in declaring a witness unqualified after the witness himself repeatedly indicates that he lacks knowledge of relevant prevailing medical standards.

In summary, we hold (a) that the judge correctly directed the jury to return verdicts for the defendant Dr. Thornton on counts 5 and 6 of the declaration and for the defendant Dr. MacDonald on counts 9 and 10 of the declaration; and (b) that the judge correctly excluded

---

personal knowledge that you had of the standards that the general practitioner or the pediatrician follows." A. "Given the disease, the clinical picture, and that fog room, that was my opinion and my opinion alone. I don't know whether pediatricians or general practitioners or anybody else would concur in it or not." THE JUDGE: "Doctor MacGillivray, are you prepared to give an opinion as to medical standards applying to Doctor Thornton on January 23rd with regard to the necessity for observation of his patient, Martha Campbell?" THE WITNESS: "No, I don't think I am." THE JUDGE: "Very good. Thank you. That concludes this voir dire. I declare that the doctor is not prepared to state an opinion on that subject."

the testimony of Dr. MacGillivray which is discussed above. [4]

*Judgments for the defendants on counts 5, 6, 9 and 10 are affirmed.*

---

[4] In view of our conclusion that the motions for directed verdicts for the defendants were properly allowed, we do not reach the question whether the negligence, if any, of either the father or mother of Martha would preclude him or her from sharing in any distribution of the proceeds of a verdict for the plaintiff administrator. *O'Connor v. Benson Coal Co.* 301 Mass. 145, 147-149 (1938). *Gaudette v. Webb,* 362 Mass. 60, 72-74 (1972). The death in the present case occurred in 1966 and therefore the doctrine of comparative negligence first incorporated into our law by statute in 1969 does not apply. G. L. c. 231, § 85, as appearing in St. 1969, c. 761, § 1.