Fremont-Smith, J.
Each of the above defendants has filed a motion for summary judgment on the ground that the undisputed “core” facts fail to provide an evidentiary basis upon which a reasonable jury could find against said defendants.
In deciding the motions, the Court may not weigh the evidence, but must deny the motions unless, on the undisputed facts, there is no reasonable probability that the plaintiffs can prevail at trial. Cassesso v. Comm'r of Correction, 390 Mass. 419, 422 (1983); Kelley v. Rossi, 395 Mass. 659, 663 (1985).
While it is true that the evidence against at least some of these defendants is far from overwhelming, the Court concludes that there are sufficient verified facts (i.e. facts asserted under oath) to raise a genuine issue of material fact as to facts which, if found by the *52 jury to be proven, could form the basis for a verdict against each of the defendants.
Peter L. Friedman, M.D.
Reduced to the bare essentials, it is not disputed that Dr. Friedman is a cardiologist who, at the request of Dr. Gilbert H. Mudge, did an electro physiological (“E.P.”) study of Mr. Lewis’s heart, which indicated that there was a possibility that Lewis was suffering from ventricular arrhythmia (a life-threatening condition), that he advised Lewis of the test results, and that he informed him that he might need to have a defribrill-ator implanted. In spite of these findings, however, there is evidence upon which a jury could conclude that, upon being told about further tests done by Dr. Creager on a “tilt table,” which indicated that Lewis’s symptoms recurred without arrhythmia, he then advised Lewis (on May 9,1993) that a defribrillator would not be needed, but that he could be treated with medication (as Dr. Mudge had concluded on the basis of Dr. Freidman’s test report, and consultation). There is also evidence upon which a jury could conclude that Dr. Friedman further indicated his concurrence with Dr. Mudge’s diagnosis and treatment plan by attending and participating without disclaimer, in a press conference where it was announced by Dr. Mudge, in Dr. Friedman’s presence, that Mr. Lewis was not suffering from ventricular arrhythmia and would not need a defribrillator. Plaintiffs cardiologist expert opines that, in view of the contrary findings which Dr. Friedman had made as a result of his own earlier tests, Dr. Friedman departed from the standard of care of the average qualified cardiologist when he retracted his earlier advice to Lewis, and when he acquiesced in Dr. Mudge’s diagnosis and course of treatment by participating, without disclaimer, in the press conference, where Dr. Mudge specifically asserted that his diagnosis and treatment plan was concurred-in by his entire “team” (i.e. by the defendants).
Defendant’s counsel does not strongly contest, for purposes of this motion, the proposition that Dr. Friedman might be found to have been a “treating doctor” of Mr. Lewis. (See Lambley v. Kameny, 43 Mass.App.Ct. 277 (1997), and other cases collected in plaintiffs briefs, regarding the factors which may be considered in determining whether a doctor-patient relationship exists). Here, it is not disputed that Dr. Friedman did examine and advise Lewis. Defendant urges, however, that while there might have been a “duty of care” owed by Dr. Friedman to Mr. Lewis, the scope of that duty was narrower than that of a primary attending physician, inasmuch as Dr. Friedman was only employed by Dr. Mudge as a consultant for a specific purpose (performing and reporting on the E.P. test), and did not have primaiy responsibility for the care and treatment of Mr. Lewis.
In support of this contention, defendant’s counsel has cited Santos v. Kim, 429 Mass. 130 (1999). In that case, the director of a medical laboratory, which had been dilatory in sending the results of blood tests to the plaintiffs treating physician, was held by the SJC to be potentially liable for negligence in the provision of medical care, even though the defendant had never examined, treated or met the plaintiff. Id. at 138. The Court held that the head of such a laboratory’s negligent failure to create protocols for the prompt delivery of medical tests, might comprise the basis for a medical malpractice suit, regardless of whether he “stood in a doctor-patient relationship to the plaintiffs.” Id. The Court characterized “the real question” as “whether the defendant owed a duty personally to the patient. The radiologist who reads an X-ray and reports his conclusion clearly does; the chief of medicine of the hospital, simply by virtue of his position, does not." Id. at 136. The Court rejected defendant’s contention that the fact that defendant “personally did not treat her, perform the analysis of her blood, or undertake personally to report the results, automatically absolved him of liability. It depends on the particular facts,” id. at 137, and concluded that the proffers of proof to the Medical Malpractice Tribunal were sufficient to raise a legitimate question of liability appropriate for judicial inquiry under G.L.c. 231, §60B. The Court further concluded that “there was sufficient evidence to suggest that [defendant’s] involvement with the care and routines of the laboratory was sufficiently personal that the case may not as a matter of law be classed with cases such as Doherty,[1] supra; Campbell,[2] supra; or Lyon v. Morphew, 424 Mass. 828, 833 (1997) . . .” Id. at 138.
It seems apparent that, if a radiologist who reads an X-ray and reports his conclusions may be liable for malpractice, even though he or she does not personally treat the patient, so may a cardiologist who is called upon to do an EP study or other test, and does so in a negligent manner.
It is true that here, Dr. Friedman ‘s testing and reporting of results (indicating possible arrhythmia and the possible need of a defribrilator) is not contended to have been negligent, but, on the contrary, to have been correct. Accordingly, if Dr. Friedman’s role was undisputedly only that of a consultant, and not that of a “hands-on” treating physician, he would not, under Santos, have owed a duty to Lewis to go beyond the scope of his specific role, or been under a duty to advise Lewis of any questions he had, or should have had, as to Dr. Mudge’s diagnosis and treatment plan. See also Shannon v. Ramsey, 288 Mass. 543 (1934) (temporary treatment given by consulting physician for a specific purpose gave rise to no duty to provide treatment or advice to patient beyond the specific scope of his consultation); Cross v. Albee, 250 Mass. 170 (1924) (physician specifically engaged for a specific purpose by the attending physician is liable only for his own negligence within the scope of his employment); Markley v. Albany Medical Center Hosp., 558 N.Y.S.2d 688 (A.D.3d 1990) (physicians who did not treat patient with respect to chemotherapy not *53 liable for negligent chemotherapy treatment unless defendants “actually undertook that function as part of the infant’s pediatric care or . . . exercised general authority or control over the actual chemotherapy treatment”); Martin v. Niagara Frontier Hockey Corp., 578 N.Y.S.2d 25 (A.D.4th. 1991) (no basis for liability against orthopedic resident for negligent diagnosis where resident was asked only to maneuver patient’s leg, and there was no evidence that defendant voluntarily undertook any more general duty).
Here, however, Friedman is asserted not only to have actually examined and given (initially correct) advice to Lewis, but he is alleged to have negligently retracted his earlier advice and, by this action and his participation in the press conference, to have effectively undertaken to adopt and support Dr. Mudge’s diagnosis and treatment plan. Plaintiffs cardiologist expert opines that this conduct, which went beyond the scope of his consultation, was negligent in view of his own prior test results .
While the evidence as to Dr. Friedman’s negligence may be far from overwhelming, the Court concludes that there is sufficient evidence upon which a jury might reasonably find liability in these circumstances.
Mark A. Creager, M.D.
Dr. Creager is a cardiologist, whose responsibilities included the supervising of “tilt table” tests on Mr. Lewis. By means of these tests, Dr. Creager was able to replicate the symptoms that Mr. Lewis had experienced when he had passed out during a Celtics game, but without Lewis experiencing arrhythmia or tachycardia. As a result, he diagnosed Lewis as probably having a structurally normal heart and recommended treatment by medication. After the tests, he performed a physical exam on Lewis, discussed the results of his tests with Lewis and took a history from him. He also actively participated in the press conference described above.
Again, relying on Santos, defendant urges that Dr. Creager, like Dr. Friedman, was only a consultant to Dr. Mudge, and had no primary care responsibility.
Plaintiffs cardiologist expert opines, however, that Dr. Creager was negligent in his consultation activity itself, i.e. even within the scope of his specific consultant engagement. His note in the medical chart stated: “It is reasonable to postulate that his symptoms of presyncope are secondary to vasodepressor-syncope (another name for neurocardiogenic syncope), particularly if all other diagnostic tests have been non-diagnostic or normal.” Plaintiffs expert opines that, while true on its face, this conclusion was negligent and misleading in view of Dr. Creager’s knowledge about earlier tests which did indicate a possibly structurally abnormal heart and possible need of a defribrillator. The expert further opines that defendant was also negligent in failing to warn Dr. Mudge, in his report, of the allegedly well-known unreliability of negative “tilt table” tests. In other words, plaintiffs allege facts which, if proven, would permit a jury reasonably to find liability, even under the more limited scope of duty delineated by Santos, supra.
Moreover, Dr. Creager, like Dr. Friedman, examined Mr. Lewis and actively participated in the press conference upon which a jury could conclude that Dr. Creager took on the role of more than a mere consultant, but that he also concurred in and endorsed Dr. Mudge’s diagnosis and course of treatment.
Although, once more, the evidence is far from overwhelming, the Court concludes that there is sufficient evidence which, if proven, would permit a jury reasonably to conclude that Dr. Creager was negligent.
John D. Rutherford, M.D.
Dr. Rutherford is a cardiologist, formerly of the Brigham, who, by 1993, was on the staff of the Medical School at the University of Texas. Having come to Boston in May, 1993, to lecture at the Brigham, he was asked by Dr. Mudge to consult on the Lewis case. Like the other defendants, he examined Lewis and conferred with Lewis, his wife, and with other cardiologists in connection with the case, but, unlike the other defendants, he did not participate in the press conference. He also reviewed all the previous tests which had been done both at the Baptist and Brigham Hospitals. Upon his return to Texas, he mailed Dr. Mudge a letter containing his diagnosis and recommended treatment, wherein he concluded that Lewis probably had a structurally normal heart with a condition which could be treated by medication. Plaintiffs urge that this recommended course of treatment and diagnosis was negligent in that it effectively ruled out the dangerous condition of arrhythmia and need for a defribrillator, even though Dr. Rutherford allegedly had access to a number of tests which indicated that Lewis’s heart was structurally abnormal and a defribrillator was possibly needed. Plaintiffs cardiologist expert opines that Dr. Rutherford was negligent in the above respects, especially in view of the fact that he knew that Mudge would particularly rely on his diagnosis and recommended treatment plan in arriving at a diagnosis and treatment plan for Lewis.
While Dr. Rutherford’s contact with the Lewis case was certainly more abbreviated than any of the other doctors, and while he did his consultation as a favor to Dr. Mudge and did not charge a fee, he did participate, on the undisputed facts, in a “hands-on” examination of Lewis, in consultations with Lewis and his spouse, and, it is alleged, in formulating the final diagnosis and treatment plan for Mr. Lewis. In view of plaintiffs expert’s opinion that he did so in a negligent manner, the Court cannot rule, as a matter of law, that if these alleged facts are proven, they would provide no reasonable basis for a possible finding of negligence against Dr. Rutherford. This is true even if, as contended by defendants, the scope of his duty to Lewis was limited to his consultative activities.
*54 SUMMARY
As this decision may be read by some who are not lawyers, the Court wishes to clarify that it arrives at no judgment as to likelihood of success on the merits of the plaintiff or of any defendant. The Court’s role in motions such as these, is merely to determine whether, if all the disputed facts were to be decided by the jury in plaintiffs favor after a trial, there would be a sufficient evidentiary basis upon which the jury could legally find for the plaintiff. The Court has no opinion, one way or the other, whether the jury is likely to find any of these alleged facts to be proven, or whether, if it did, the jury would be likely to conclude that the facts as proven would indicate that any of the defendants were indeed negligent. That ultimate determination is, of course, solely within the province of the jury.
ORDER
For the foregoing reasons, defendants motions for summary judgment are DENIED.

 Doherty v. Heilman, 406 Mass. 330 (1989).

 Campbell v. Thornton, 368 Mass. 528 (1975).