Fecteau, J.
Plaintiffs, Tammy and James Derry (the “Derrys”) brought this wrongful death action against the defendants, Edward G. Peskin, M.D. (“Dr. Peskin”), Saint Vincent Hospital (“SVH"), various treating physicians, a nurse, two emergency medical technicians and an ambulance service, seeking monetary damages as a result of the death of their unborn child. The Derrys assert claims of negligence, wrongful death, and loss of consortium against Dr. Peskin in his role as Director[2] of the Department of Obstetrics and Gynecology (“Ob/Gyn”). Specifically, the Derrys assert that as Director, Dr. Peskin breached his duty to ensure that the Ob/Gyn Department complied with certain provisions of 42 C.F.R. §489.24, the Emergency Medical Treatment and Active Labor Act (“EMTALA”) which, had they been in place when the Derrys presented to SVH, would have prevented the Derrys’ injuries.
Dr. Peskin is before the court on his motion for summary judgment asserting that although he was Director of the Department of Ob/Gyn, he was not Mrs. Derry’s physician at time in question, and did not bear, either in fact or in law, any supervisory responsibility over Mrs. Derry’s treating physicians. Therefore, Dr. Peskin argues that he cannot be held either directly or vicariously liable for any alleged medical malpractice. Dr. Peskin has moved for summary judgment pursuant to Mass.R.Civ.P. 56(c). For the reasons stated below, Dr. Peskin’s motion for summary judgment is DENIED.

BACKGROUND

In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmov-ing party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to the plaintiffs and should not be misunderstood as findings of the court.
Mrs. Derry presented to the Emergency Department at SVH on March 31, 1996 with complaints of vaginal bleeding. At that time, Mrs. Derry was informed that she was pregnant and thereafter discharged. On June 18, 1996, Mrs. Derry again presented to SVH with complaints of vaginal bleeding, and Dr. Peskin treated her. Mrs. Derry’s diagnosis at that time was ‘bleeding *658 from placenta previa.’ Mrs. Derry was admitted for observation and discharged the following day. Mrs. Derry received follow-up care from her physician, Defendant Arthur Curtis, M.D. (“Dr. Curtis”). The plaintiff makes no claim that Dr. Peskin acted negligently on that occasion.
Three weeks later, on July 8, 1996, Mrs. Derry presented to the Emergency Department at SVH in pre-term labor. At that time, a resident physician, Cristina Schram, M.D. (“Dr. Schram”) saw Mrs. Derry. Fetal monitoring then began at approximately 8:30 p.m. An intravenous line was started in Mrs. Derry’s left arm, and blood was drawn for lyping and screening. Medical records reveal that no other medical treatment or intervention took place at that time. No evaluation and no assessment by Dr. Schram are documented in the medical records provided to date. Dr. Curtis was called at 8:30 p.m. and notified of Mrs. Derry’s condition and her admission to SVH.
After Dr. Curtis arrived at 10:10 p.m., an ultrasound was performed on Mrs. Derry, revealing that no amniotic fluid remained in the uterus and that the unborn child was in a breech position. Records reflect that Dr. Curtis made a decision at 10:10 p.m. to transfer Mrs. Derry to the Medial Center of Central Massachusetts — Memorial Campus (“MCCM”) for management of delivery. The fetal heart rate was noted to show significant increase in fetal distress.
At 10:40 p.m., Mrs. Derry received medication to abate her increased pain. Records reflect prolonged variability of the fetal heart rate indicating increasing fetal distress. Dr. Curtis discharged Mrs. Derry from the Labor and Delivery Unit at SVH at 10:50 p.m. for transport to the Labor and Delivery Unit at MCCM.
Mrs. Derry arrived at the Labor and Delivery Unit of MCCM at 11:40 p.m. To date, no documentation exists of an assessment of Mrs. Derry or her unborn child during transport. Upon arrival at MCCM’s Labor and Delivery Suite, an immediate ultrasound was performed. The test revealed a breech presentation of the baby with no amniotic fluid remaining. The fetal heart rate was noted to be 40 beats per minute. Also, the umbilical cord had prolapsed into Mrs. Derry’s vagina. Due to the significant deterioration of the fetal condition, the Derrys were counseled regarding the grave prognosis for the baby. Christopher Michael Derry was born without a heart beat at 1:58 a.m. on July 9, 1996. Dr. Peskin was not present and did not see or treat Mrs. Derry on July 8, 1996.
On May 27, 1997, The Massachusetts Division of Health Care Quality surveyed SVH as a result of a patient dumping[3] complaint made on behalf of the Derrys. Specifically, the basis of the survey was an allegation of noncompliance by SVH with the requirements of the EMTALA. As a result of the survey, the Massachusetts Department of Health and Human Services (“DHHS”) found SVH in violation of the requirements of 42 C.F.R. §489.24 with respect to the Derrys based on its failure to provide a medical screening examination, stabilization of medical condition, and failure to effectuate an appropriate transfer. The DHHS found the following with regard to the transfer:
1. The Physician told the Surveyors at the time of the complaint investigation that he was aware of the decline in the fetal heart rate after his initial conversation with the Physician at the receiving hospital at 10:30 p.m. on 7/8/96. The Physician stated that he saw the monitor and noted the fetal heart rate was seriously unstable. The Physician stated to the Surveyors that he should have called the Physician at the receiving hospital back to update the Physician on the changes in the fetal heart rate but failed to do so and instead transferred the patient to the receiving hospital at 10:50 p.m.
2. The RN (registered nurse) assisting with the transfer stated that she was aware of the changes in the fetal heart rate and that the changes were serious. Knowing this, the RN failed to bring a doppler with her in the ambulance to monitor the fetal heart rate. Standards of nursing practice recommend an unstable fetal heart rate be monitored every five (5) minutes.
3. Although all medical records reviewed had documented evidence that the Physician reviewed the reason for transfer with the patient and her significant other and she/they accepted the transfer, eight (8) of twenty-one (21) medical' records reviewed were lacking patient signatures on the transfer form which is required by the hospital for transfer to another acute care facility. Two (2) of twenty-one (21) medical records were missing the signed hospital required transfer forms altogether.
SVH and Dr. Peskin then promulgated new policies and procedures in or about July 1997 to remedy this violation.
The Derrys commenced suit against Dr. Peskin on August 8, 1997.

DISCUSSION

To prevail on summary judgment, the moving party must establish that there is no genuine issue of material fact on every element of a claim and that it is entitled to judgment on that claim as a matter of law. See generally Mass.R.Civ.P. 56(c); Highlands Insurance Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party has established the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Id. at 17.
*659 A party moving for summary judgment who does not bear the burden of proof at trial demonstrates the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis v. General Motors-Corp., 410 Mass. 706, 716 (1991). The nonmoving party cannot defeat the motion for summary judgment by resting on its “pleadings and mere assertions of disputed facts ...” LaLonde v. Eissner, 405 Mass. 207, 209 (1989). Rather, the non-moving party must respond by alleging specific facts demonstrating the existence of a genuine issue of material fact. Pederson v. Time, Inc., supra at 17.
The dispute between the parties to this case is whether Dr. Peskin’s responsibilities as Director of the Ob / Gyn Department regarding policy implementation and procedure, specifically concerning the EMTALA, created a duty to the plaintiffs on July 8, 1996.
Until the Supreme Judicial Court’s very recent decision in Santos v. Kim, 429 Mass. 130 (1999), the precedent at that time favored the defendant’s position. In Santos, the court dealt with a malpractice claim brought against the director of a blood bank and hematology laboratory. The court found that sufficient evidence existed which suggested that the director’s involvement with the care and routines at the laboratory was sufficiently personal that the case could not as a matter of law be classed with cases such as Doherty v. Hellman, 406 Mass. 330 (1989), and Campbell v. Thornton, 368 Mass. 528. In so doing, the court distinguished Santos, supra, from precedent that historically refused to recognize the liability of a physician solely based on his capacity as a director of medical staff.
Specifically, in Doherty, supra, the plaintiff based her claim on negligent treatment and on the failure to inform her of the risks of an innovative course of radiation therapy. 406 Mass. at 330. Doherty complained that Dr. Heilman was “liable to the plaintiff for the negligence of the other physicians practicing at the Joint Center for Radiation Therapy [JRCT]. ” Id. at 331. The plaintiff sought to impose liability on the defendant-physician despite the absence of a doctor-patient relationship during the treatment in question “simply on the basis that ‘as Director[4] of the [JRCT], [the defendant] had a duty to monitor [the plaintiffs] care.’ ” Id. at 335. The court held that because the defendant was not the plaintiffs treating physician and because her treating physician had undertaken to provide her with appropriate informed consent, he could not be held liable on his own account for any negligence or failure to inform the plaintiff. The court noted further that “Campbell v. Thornton, [supra] [also] protects the defendant from vicarious liability solely because he was director of [a medical staff].” Doherty, 406 Mass. at 335. In Campbell, the plaintiff sued the chief of medical staff for an accident that occurred on one of the hospital’s services, and the court held that “[a physician’s] position as chief of the medical staff would not, without more, make [him] liable under the doctrine of respondeat superior.” Campbell, 368 Mass. at 535-36.
Relying on Doherty, supra and Campbell, supra, this Court agrees that Dr. Peskin cannot be held vicariously liable for the actions of Mrs. Derry’s treating physicians, and therefore, summary judgment should be granted to that extent. This Court does find, however, that important, material factual issues in dispute exist that may or may not put this case in the same category as Santos v. Kim.
Therefore, Defendant Peskin is not entitled to summary judgment on the issue of liability because genuine issues of material fact exist regarding the extent and breadth of Dr. Peskin’s duties as Director of the Department of Ob/Gyn. Specifically, conflicting testimony, depositions, answers to interrogatories and affidavits exist as to Dr. Peskin’s job description.
The plaintiffs allege that “Dr. Peskin in his role as Director of the Department of Obstetrics and Gynecology at SVH, negligently failed to: supervise Ob/Gyn Department personnel to assure compliance with EMTALA, have policies and procedures in place to ensure compliance of his staff with the transfer provisions of EMTALA,” and; “have trained and qualified resident physicians” on staff at SVH. The plaintiff relies on Santos in support of their contention that a director’s personal involvement with the care and routine of a department coupled with the fact that the department personnel looked to him to set the details and policies and procedures may be sufficient to hold him personally liable. This Court finds that Santos supports the plaintiffs contention that Dr. Peskin’s responsibilities with regard to the Department’s compliance with EMTALA may have created a personal duty to the Derrys.
In Santos, supra, the plaintiff alleged that the laboratory, and its director, Dr. Adner, failed to communicate critical test results to her treating physicians in a timely manner. Id. As a result, the plaintiff underwent an unnecessary caesarian section and her child died. Id. The Supreme Judicial Court was asked to decide whether a medical malpractice tribunal pursuant to G.L.c. 231, §60B should properly consider such a claim. Id. The Court held that the claim against Dr. Adner was properly subject to review by a tribunal pursuant to G.L.c. 231, §60B. Santos, supra, at 134.
The “claimed malpractice, or wrongful conduct, or breach of duty by Dr. Adner was his failure to institute practices and procedures such that critical test results reached a patient’s physician promptly.” 429 Mass. at 134. Santos argued that had such policies and procedures been in effect, her blood test results would have timely reached her treating physicians whose exercise of independent judgment would have been affected by *660 the test results. Id. at 137. Dr. Adner’s failure to ensure that laboratory test results were transmitted timely to the patient’s treating physician arguably created in him a duty running to the patient. Id. at 138. The court did distinguish Doherty, supra, noting that medical services are frequently rendered in “settings with some degree of hierarchical organization, at the head of which is a senior, respected figure, even though the patients receive treatment from their own physicians, who are skilled professionals expected to exercise independent judgment.” 429 Mass. at 135. The court did state, however, the importance of avoiding the creation of precedent that never holds any human being responsible for the failures of the system. Id. The court asserted that, Dr. Adner’s “position as Director of the laboratory will not of itself be sufficient to make out such a duty to the plaintiff, but neither does the fact that he personally did not treat her, perform the analysis of her blood, or undertake personally to report the results automatically absolve him of liability. It depends on the particular facts.” 429 Mass. at 137.
The Santos court relied on certain evidence in finding that Dr. Adner’s involvement with the care and routines at the laboratory in his capacity as Director, were sufficiently personal. 429 Mass. at 138. Specifically, the court noted that policies and procedures regarding testing were developed in consultation with and approved by Dr. Adner. Id. at 137. The court further noted that after the incident, it was Dr. Adner who instituted a new policy regarding testing and notification of test results. Id at 138. In finding sufficient evidence to hold Dr. Adner personally responsible, the court found compelling that the laboratory personnel looked to Dr. Adner to set the details of the policies and procedures on the matter that was the basis of the plaintiffs claim. Id. The court concluded that the evidence was sufficient to raise a legitimate question of liability appropriate for judicial inquiry because the evidence suggested that Dr. Adner’s involvement with the care and routines at the laboratory was sufficiently personal, that the case could not, as a matter of law, be classed with former cases that found no liability of directors solely because of their position. Id. Thus, Dr. Adner’s failure to ensure that laboratory test results were transmitted in a timely fashion to the patient’s treating physician arguably created in him a duty running to the patient.
Similarly, plaintiffs proffer of evidence includes the job description of the Chief of Department of Obstetrics and Gynecology for SVH, indicating that the job includes development and implementation of guidelines and protocols pertaining to the practice of obstetrics and gynecology. Additionally, the description sets forth that the Chief of the Department establishes the standards of care for the OB / GYN Department at SVH. Also, Dr. Peskin’s duties included participation in and the development and implementation of policies and procedures pertaining to the practice of obstetrics and gynecology.
The offer of proof also shows that Dr. Peskin, like Dr. Adner, was involved in the plan of correction to institute new policies and procedures regarding transfer and consent for transfer. Like Santos, the evidence of Dr. Peskin’s involvement in the plan of correction is compelling in showing his personal responsibility to ensure that the personnel of his department followed proper policies and procedures. Further, depositions reveal that Dr. Peskin was responsible for the policies and procedures of the Department and that Dr. Peskin had supervisory responsibilities regarding the physicians, the midwives and the residents.
Dr. Peskin asserts in his deposition that the job description was not an accurate description of his job position in July 1996. Thus, as in Santos, there may be sufficient evidence demonstrating that Dr. Peskin’s involvement with the care and routines of the Ob/Gyn Department could have created a duty running to the Derrys.
In Santos, the court warned that it “must avoid holding that in every case where there is institutional liability there must always be a responsible individual as well, because an overly determined search for such an individual may sometimes turn up no one else than some distant senior member of the institutional hierarchy with formal responsibility for the workings of the systems reporting to him in the institutional chain of command. This may be appropriate in the military, but it is not the rule as to civil liability in tort.” 429 Mass. at 136. While this Court recognizes the possibility that every Director may not have a personal duty to every patient that comes into the hospital, I cannot say as a matter of law that no issue exists as to Dr. Peskin’s responsibilities as director of the Ob/Gyn Department at SVH.
Accordingly, summary judgment should not be granted with respect to the Derry’s claim of liability regarding Dr. Peskin.

ORDER

For the reasons stated above, it is hereby ORDERED that Defendant Peskin’s motion for summary judgment is DENIED.

 It is unclear from the record when Dr. Peskin was appointed Director of the Department of Obstetrics & Gynecology-

 When an individual at a hospital has an emergency medical condition that has not been stabilized, the hospital may not transfer the individual unless the transfer is an appropriate transfer. A complaint alleging an inappropriate transfer is oftentimes referred to as “patient dumping."

 The defendant was not her treating physician, rather he was the director of the center where the plaintiff was treated and had designed and pioneered the treatment that the patients at the center received and set the standards for its administration. He reviewed the results of treatments in the center and reported them in the medical literature, 406 Mass. at 334.