NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

13-P-1610                                    Appeals Court

MONYRETH THOU, administrator,[1] vs. JOSEPH RUSSO.

No. 13-P-1610.

Middlesex.    June 3, 2014. - October 23, 2014.

Present: Cypher, Brown, & Agnes, JJ.

Medical Malpractice, Tribunal, Bond, Standard of care. Negligence, Medical malpractice, Doctor. Doctor.


Civil action commenced in the Superior Court Department on April 17, 2012.

A motion to dismiss was heard by Maureen B. Hogan, J.


John N. Lewis for the plaintiff.
Gisela M. DaSilva for the defendant.


CYPHER, J. The plaintiff, administrator of the estate of Sophal Chan Chin (decedent), appeals from a Superior Court judgment dismissing his malpractice action against the defendant doctor, Joseph Russo, following an adverse decision of a medical malpractice tribunal and the plaintiff's failure to post a bond.

_____

[1] Of the estate of Sophal Chan Chin.

See G. L. c. 231, § 60B.  We agree with the plaintiff that his offer of proof was sufficient.

Background.[2]  The decedent died from cardiac arrest after liposuction and abdominoplasty[3] procedures performed at Milton Hospital (hospital) by Russo on May 17, 2011.  As detailed by Russo in his operation report, after the decedent was brought into the operating room, a general anesthesia was induced.  In performing the liposuction procedure, Russo utilized a tumescent solution[4] containing xylocaine (lidocaine) and epinephrine delivered through "several small stab incisions" into the areas to be suctioned.  Approximately one liter of tumescent solution was infused into each side of her waist.  In treating the medial thigh and knee areas, approximately 600 milliliters of tumescent solution were infused.  When the upper arms were treated, approximately 300 to 400 milliliters of tumescent solution were

_____

[2] We take the facts from the plaintiff's offer of proof; they are assumed to be true for purposes of our review.  Cooper v. Cooper-Ciccarelli, 77 Mass. App. Ct. 86, 87 n.2 (2010).

[3] Here, abdominoplasty was the surgical alteration of a preexisting scar and of tissues to improve the contour of the abdomen.

[4] The tumescent technique for liposuction utilizes a dilute anesthetic solution of lidocaine and epinephrine which produces swelling and firmness of the targeted fatty areas to facilitate suctioning of the fat.  Lidocaine provides local anesthesia, and epinephrine constricts small blood vessels to prevent absorption of lidocaine into the bloodstream and to prolong the anesthesia. See generally Klein, The Tumescent Technique:  Anesthesia (2010).

infused into each upper arm.  Russo recorded that the total infusion was 3,800 milliliters (or 3.8 liters).  No tumescent solution use was reported for the abdominoplasty.

The two procedures took place between 1:30 P.M. and approximately 6:00 P.M.  Russo reported that, as the abdominal wound was about one-half closed, at about 6:03 P.M., the anesthesiologist reported a sudden drop in the decedent's blood pressure.  Code emergency procedures immediately were instituted and performed over the next one and one-half hours.  The decedent briefly was stabilized to a normal blood pressure and was transferred to the intensive care unit.  After about one hour, she suffered cardiac arrest, was unable to be resuscitated, and was declared dead at 9:50 P.M.[5]

The plaintiff filed a complaint in the Superior Court on April 17, 2012, alleging that the decedent's death was caused by Russo's negligence.  Russo requested a medical malpractice tribunal pursuant to G. L. c. 231, § 60B.  Following the submission of an offer of proof by the plaintiff, and a hearing, the tribunal issued a report stating that "there is not sufficient evidence to raise a legitimate question as to liability appropriate for judicial inquiry."  When the plaintiff

---

[5] The intensive care unit physician recorded the cause of death as "severe pul[monary] edema" and "cardiac arrest."  The medical examiner's certificate stated the cause of death as "complications of abdominoplasty and liposuction."

failed to post the required bond, judgment entered dismissing the plaintiff's complaint.  He timely appealed.

Discussion.  The plaintiff's claim of malpractice essentially is that Russo failed to conform to the requisite standards of care in his administration of the anesthetic solution which allegedly was given in toxic doses, causing the decedent's death.[6]  The plaintiff's offer of proof consists of a memorandum of facts and law; an opinion letter of a medical expert, Dr. Robert M. Stark,[7] his curriculum vitae, and the published articles on which he relied; the decedent's Milton Hospital records; the medical examiner's records; and Russo's office records.

We test the sufficiency of an offer of proof by viewing the evidence "in a light most favorable to the plaintiff," Blake v. Avedikian, 412 Mass. 481, 484 (1992), to determine principally whether Russo's "performance did not conform to good medical practice," and whether damage resulted.  Santos v. Kim, 429

---

[6] The plaintiff's brief alleges that two members of the tribunal were biased based on their personal or professional relationships with defense counsel.  The allegation was not made below and we do not consider it.  See Blood v. Lea, 403 Mass. 430, 435-436 (1988).

[7] Dr. Stark, board certified in cardiology and internal medicine, and familiar with authorities and published literature in liposuction practice, appears well qualified and was not seriously challenged by Russo.  See Letch v. Daniels, 401 Mass. 65, 68 (1987) (expert need not be specialist in medical area concerned, but should have education, training, experience, and familiarity with subject matter of testimony).

Mass. 130, 133 (1999) (citation omitted).  An offer of proof is sufficient if "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff."  St. Germain v. Pfeifer, 418 Mass. 511, 516 (1994) (citation omitted).  See Little v. Rosenthal, 376 Mass. 573, 578 (1978) (tribunal's task similar to trial judge's function in ruling on defendant's motion for directed verdict).

The principal thrust of Dr. Stark's opinion is that Russo deviated from the standard of care by ordering the infusion of a toxic dose of tumescent solution, which caused the decedent's cardiac arrest.  Dr. Stark noted that, before the procedures began, by "the end of one hour, this [intravenous (I.V.)] infusion provided the [decedent] a dose of 1 mg epinephrine and 400 mg of lidocaine. . . .  During the ensuing liposuction procedure, Dr. Russo administered a total of 3.85 liters of 'tumescent solution' that . . . delivered an additional dose of 3.8 mg of epinephrine and 1,340 mg of lidocaine to the [decedent's] subcutaneous tissue."  Given these facts, Dr. Stark opined:

> "[I]t is my opinion to a reasonable degree of medical certainty that Dr. Russo failed to exercise that degree of skill and care of the average qualified practitioner of medicine in general and as a surgeon of any specialty by: (1) prescribing and ordering the perioperative I.V. infusion of a toxic dose of tumescent anesthetic solution; (2) failing to prevent the I.V. administration of a toxic

dose of anesthetic solution by reviewing his orders before performing the procedure; and (3) failing to realize that his patient had received the tumescent anesthetic I.V., thereby compromising further resuscitative efforts by the administration of additional lidocaine and epinephrine as part of the Advanced Cardiac Life Support (ACLS) protocol. It is my further opinion to a reasonable degree of medical certainty that it was the toxic dose of epinephrine contained in the I.V. and potentiated by the co-administration of lidocaine which caused [the decedent's] death and that, notwithstanding Dr. Russo undertaking a combination of liposuction and an abdominoplasty under general anesthesia which carries the highest risk of morbidity according to the literature, . . . but for his ordering, allowing and not realizing that she had received an I.V. infusion of the anesthetic solution, [the decedent] would have survived the procedure."

Citing opinions of authorities in published papers that "liposuction by local anesthesia is safer than liposuction by general anesthesia,"[8] and that "there have been no deaths associated with tumescent liposuction totally by local anesthesia without parenteral narcotic analgesia or general anesthesia,"[9] Dr. Stark stated that, based on his "own education, training and experience as a cardiologist, it is my opinion to a reasonable degree of medical certainty, that there was no clinical indication or reason to administer perioperative fluids containing epinephrine and lidocaine to [the decedent]."[10]  Dr.

---

[8] Klein, The Tumescent Technique:  Anesthesia (2010).

[9] Klein, The Two Standards of Care for Tumescent Liposuction (1997).

[10] Dr. Stark also noted, "In situations of extreme bradycardia or hypotension where epinephrine is required, the dose ranges from 0.2 to 10 micrograms per minute, or 120 to 600

Stark concluded that the "ventricular ectopy and fibrillation that [the decedent] developed in the [operating room] were, in my opinion to a reasonable degree of medical certainty, the result of an epinephrine overdose."

In response, Russo claims that he ordered the tumescent solution only to be administered subcutaneously, and not intravenously.  Referring to his preoperative orders, he asserts that he ordered standard lactated "Ringer's" solution,[11] which does not contain epinephrine or lidocaine, to be administered intravenously; he points to hospital anesthesia records showing that Ringer's solution was administered intravenously between 1:30 P.M. and 5:00 P.M.  However, Dr. Stark points to a hospital "provider order summary" that shows that a secondary intravenous infusion (IV) was ordered, specified as follows:

```
"Start:  05/17/11  0753
"Stop:  05/17/11  0852

"Lactated Ringers   Volume:  1000 ML
"Lidocaine 2 20ML   Dose:  400MG
"Epinephrine        Dose:  1 MG
"Rate:  1021 MLS/HR
"Infusion Site:  IV"
```

microgphrams per hour.  [The decedent] was given over 1,000 micrograms of I.V. epinephrine in the first hour followed by 3,800 micrograms of epinephrine delivered to her subcutaneous tissues."

[11] Ringer's solution, also known as Ringer lactate, resembles "blood serum in its salt constituents" and is "used as a fluid and electrolyte replenisher by intravenous infusion." Stedman's Medical Dictionary 1787 (28th ed. 2006).

The electronic medication administration record also lists an order for 1,000 milliliters of "lactated Ringer's," specifying the same amounts of lidocaine and epinephrine as the hospital anesthesia record, and adding "label cmts: tumescent anesthesia" scheduled for intravenous route.

Dr. Stark also found that Russo failed to note in his operation report the use of Marcaine (bupivacaine), "a local anesthetic twice as powerful as lidocaine and more cardiotoxic." The use of Marcaine also had not been recorded with the other medications in the decedent's chart. Dr. Stark, however, discovered an entry in a nurse's note that forty-five milliliters of "25 Marcaine & epi[nephrine]" had been administered, apparently during the ACLS protocol. He noted that Marcaine was administered "directly into the area where the surgical incision was made to perform the abdominoplasty."[12] Dr. Stark opined to a reasonable degree of medical certainty that lidocaine and Marcaine "by themselves can cause ventricular tachycardia and ventricular fibrillation," and that "severe and

_____

[12] Dr. Stark stated he could not "definitively assess the harm that may have been contributed by these excessive doses [of Marcaine, epinephrine, and additional lidocaine delivered subcutaneously] because [the decedent] was under general anesthesia when they were given." His inability to assess that harm does not negate his ultimate conclusion that these excessive doses compounded the toxicity that contributed to her death.

intractable arrhythmia can occur with the accidental IV injection [of lidocaine]."

Finally, Dr. Stark stated that the "hospital record is incomplete and inconsistent as [to] the amount of I.V. fluids given, but at the time [the decedent] was pronounced dead, she had gained 10.4 kg (22+ lbs) due to I.V. fluids (measured during the autopsy)." He stated that pulmonary edema was unavoidable, and that the toxicology report was unreliable because the analgesic medications and epinephrine had been "massively diluted" by the IV fluids.[13]

Specifically, Dr. Stark's letter tracks the breach of Russo's duty to conform to good medical practice with Dr. Stark's statements regarding the administration of a toxic dose of tumescent solution, the use of general anesthesia, and the use of Marcaine. Dr. Stark links these actions by Russo to the decedent's death, satisfying the requirement of causation. Because the plaintiff's offer of proof regarding his claim against Russo contained evidence that, "if substantiated, would reasonably support an inference . . . that [Russo's] performance did not conform to good medical practice, and that injury to the [decedent] resulted therefrom," the tribunal erred in holding

---

[13] A postmortem analysis of the decedent's blood, taken at 6:42 P.M. did not detect the presence of lidocaine. A second postmortem analysis of a sample taken at 9:00 P.M. detected a nontoxic level of lidocaine.

otherwise.  St. Germain v. Pfeifer, 418 Mass. at 518.  Thus, the plaintiff was not required to post a bond to prevent dismissal of his claim against Russo.

The judgment of the Superior Court is vacated.  The matter is remanded to the Superior Court where the determination of the tribunal is to be substituted by a determination that the plaintiff's offer of proof was sufficient to raise a legitimate question appropriate for judicial inquiry.[14]

So ordered.

---

[14] The plaintiff's request for appellate attorney's fees is denied.