From April 8, 2011, to November 28, 2012, Michael Abraham was under the care of his primary care physician, Mohamed Elgeziry, M.D. Over that time period, Abraham on multiple occasions complained of various symptoms, including several that are commonly associated with heart disease, such as chest tightness and shortness of breath. Dr. Elgeziry provided certain diagnoses unrelated to heart disease, and to address these issues, he prescribed various medications. Dr. Elgeziry also referred Abraham to a neurologist. Dr. Elgeziry never diagnosed Abraham with, or treated him for, heart disease ; he also did not refer him to a cardiologist.
On November 28, 2012, Abraham was taken to an emergency room in full cardiac arrest, and a "100 [percent] occlusion of his left anterior descending artery" was discovered. He died five days later at the age of forty-six. His mother, Phyllis Greene, filed this medical malpractice action in Superior Court as the personal representative of his estate. In it, she alleged that Dr. Elgeziry's failure to appreciate and address Abraham's heart disease violated the applicable standard of care and caused Abraham's premature death.[4]
In accordance with G. L. c. 231, § 60B, the matter was referred to a medical malpractice tribunal.[5] After a hearing, the tribunal concluded that Greene's offer of proof, even if properly substantiated, was insufficient to raise a "legitimate question of liability appropriate for judicial inquiry." G. L. c. 231, § 60B, inserted by St. 1975, c. 362, § 5. Greene did not post the $6,000 bond required by the statute, and her action against Dr. Elgeziry therefore was dismissed. See ibid. ("If [the] bond is not posted within thirty days of the tribunal's finding [for the defendant] the action shall be dismissed"). Because we agree with Greene that her offer of proof was adequate, we reverse.[6]
Standard of review. "Before a [medical] malpractice tribunal, a plaintiff's offer of proof must (1) show that the defendant is a provider of health care as defined in G. L. c. 231, § 60B ; (2) demonstrate that the health care provider [in question] did not conform to good medical practice; and (3) establish resulting damage." Saunders v. Ready, 68 Mass. App. Ct. 403, 403-404 (2007), citing Santos v. Kim, 429 Mass. 130, 132-134 (1999). The relevant standard of care is the one that applies to "the average qualified physician in his or her area of specialty" (in this case, a primary care physician). Medina v. Hochberg, 465 Mass. 102, 106 (2013). Whether the physician met the applicable standard of care generally can be answered only with the aid of expert opinion. See Kapp v. Ballantine, 380 Mass. 186, 190 & n.4 (1980). The expert opinion must be rooted in the record evidence and not be based on speculation, conjecture, or assumptions not supported by the evidence. Blood v. Lea, 403 Mass. 430, 434 (1988).
In determining whether a plaintiff's offer of proof is sufficient, "[t]he question to be decided ... by the tribunal is a factual one." Kopycinski v. Aserkoff, 410 Mass. 410, 413 (1991). However, the tribunal's task is "akin to a trial judge's evaluation of a motion for a directed verdict." Cooper v. Cooper-Ciccarelli, 77 Mass. App. Ct. 86, 91 (2010), citing Little v. Rosenthal, 376 Mass. 573, 578 (1978). Thus, "the tribunal may not examine the weight or credibility of the evidence." Cooper, 77 Mass. App. Ct. at 91, citing Perez v. Bay State Ambulance & Hosp. Rental Serv., Inc., 413 Mass. 670, 676 (1992). Instead, it must consider the proof in the light most favorable to a plaintiff.[7] Blake v. Avedikian, 412 Mass. 481, 484 (1992). "An offer of proof is sufficient if 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.'" Thou v. Russo, 86 Mass. App. Ct. 514, 516 (2014), quoting from St. Germain v. Pfeifer, 418 Mass. 511, 516 (1994).
Background. a. Facts. We summarize the facts drawn from the medical records, reserving some particulars for later discussion. Abraham visited Dr. Elgeziry twelve times from April, 2011, through July, 2012. During his visits, Abraham presented to his primary care physician numerous complaints about various symptoms he was experiencing, including, but not limited to, chest tightness and congestion, fatigue, weakness, general malaise, severe bilateral posterior neck and shoulder pain radiating to arms, wheezing, difficulty breathing, and sexual dysfunction.
Based on Abraham's complaints and test results, Dr. Elgeziry diagnosed Abraham with various maladies, including upper respiratory infection, asthma, seizure disorder, pernicious anemia, hypercholesterolemia, and hypogonadism. Dr. Elgeziry prescribed various medications to Abraham, including antibiotics, vitamin B12, omeprazole, prednizone, and topical testosterone cream. Dr. Elgeziry also referred Abraham for neurological consultation, which resulted in Abraham's being diagnosed with having had a grand mal seizure, cervical radiculopathy, and degenerative disc disease.
On November 28, 2012, Abraham was found unconscious in his house by his girl friend. He was rushed to the emergency department of Brockton Hospital, where he was diagnosed with a "full cardiac arrest" and acute myocardial infarction with a "100 [percent] occlusion of the left anterior descending artery." On November 30, 2012, Abraham was found to have suffered "an irreversible insult to the nervous system with really no reasonable chance of functional survival." On December 3, 2012, he died. The cause of death was determined to be "anoxic brain injury secondary to myocardial infarction."
b. Expert opinion. Before the tribunal, Greene submitted an expert opinion letter that had been prepared by Paul Genecin, M.D., a physician board-certified in internal medicine and a clinical associate professor at Yale School of Medicine. Among his other conclusions, Dr. Genecin opined that "the signs and symptoms of coronary artery disease include, but are not limited to, dyspnea, dyspnea on exertion, reduced exercise tolerance chest pain/angina, chest tightness, persistent symptoms of heartburn despite treatment, left arm pain, left shoulder pain, left neck pain, left arm numbness/tingling, dry cough, acute and intermittent episodes of wheezing." Dr. Genecin further noted that under the applicable standard of medical care, which was well established by 2011, the patients displaying the symptoms of coronary artery disease should be referred to a cardiologist for further testing, assessment, and treatment. He specifically criticized Dr. Elgeziry for prescribing the testosterone cream for Abraham where testing had revealed no hormone deficiencies and where use of such a cream had the potential to exacerbate any cardiac problems.
Dr. Genecin further stated that "in [his] professional opinion, to a reasonable degree of medical certainty, the care and treatment rendered to Michael Abraham between [April 8, 2011,] and [November 28, 2012,] by [Dr. Elgeziry] deviated from the accepted standard of care," because Dr. Elgeziry failed to recognize and appreciate the symptoms displayed by Abraham as the signs of coronary artery disease, failed to order or refer Abraham for cardiac work-up, failed to offer appropriate pharmacologic treatment to Abraham, and failed to refer Abraham to a cardiologist. Dr. Genecin concluded that "[a]s a direct result of Dr. Elgeziry's deviation from the accepted standard of care, ... Abraham was not evaluated by a cardiologist for [coronary artery disease ] causing a significant delay in the diagnosis and treatment of his underlying cardiac condition and, ultimately, resulting in a massive myocardial infarction, anoxic brain injury, and his premature and preventable death."
Discussion. As the record amply reveals, Abraham repeatedly had presented his primary care physician with complaints about symptoms that, according to the expert opinion letter, were indicative of coronary artery disease. Furthermore, based on specific facts reflected in the medical record, Greene's expert opined that Dr. Elgeziry's failure to address such symptoms constituted a deviation from the standard of care and that this caused Abraham's death.
To the extent that Dr. Elgeziry argues that the expert opinion letter is based on facts that are contradicted by the medical records, we are unpersuaded. For example, while it is true that the medical records do not contain a specific reference to Dr. Elgeziry's having concluded that Abraham suffered from heartburn, this can be inferred from the fact that Dr. Elgeziry prescribed him omeprazol (which is used to treat acid reflux symptoms). In addition, while the medical records may not include a specific reference to Abraham's experiencing chest "pain," they do include multiple references to his having experienced chest "tightness," as well as other forms of pain associated with cardiac conditions.
To be sure, Dr. Elgeziry is able to point to certain facts that arguably cut against Greene's claim that he violated the standard of care. For example, he highlights that Abraham exhibited a number of additional symptoms that pointed to noncardiac causes,[8] and that during particular visits, Abraham did not exhibit certain signs potentially indicative of heart disease.[9] In the end, Dr. Elgeziry may be able to use such arguments to persuade the fact finder that he acted reasonably and fully complied with the applicable standard of care. However, that is not something that can be resolved on the current record without straying into the inappropriate role of weighing the evidence. See Cooper v. Cooper-Ciccarelli, 77 Mass. App. Ct. at 91. For present purposes, the medical records and the expert's "detailed report, fairly read, presented more than conclusory assertions, and provided evidence from which a reasonable juror could infer sub-par professional conduct on [Dr. Elgeziry's] part." Lambley v. Kameny, 43 Mass. App. Ct. 277, 287 (1997). This was sufficient.
Dr. Elgeziry separately argues that the offer of proof does not sufficiently establish causation between Abraham's death and his deviation from the standard of care. "Not a great deal is required to fend off a directed verdict on the issue of causation. It is enough to adduce evidence that there is a greater likelihood or probability that the harm to the plaintiff flowed from conduct for which the defendant was responsible." Joudrey v. Nashoba Community Hosp., Inc., 32 Mass. App. Ct. 974, 976 (1992), quoting from Held v. Bail, 28 Mass. App. Ct. 919, 921 (1989). Admittedly, the portion of the expert's opinion letter that directly addressed causation is phrased in fairly conclusory terms. However, the portion of the letter that addresses the standard of care fills in details regarding specific steps that could have been taken to address Abraham's heart disease, such as catheterization. Moreover, the medical record indicates that catheterization was performed on Abraham after his heart attack. This appears to have successfully unclogged his artery (even though the intervention was, at that point, too late to save his life). Reading the offer of proof as a whole, we conclude that it presented a sufficient showing of causation.[10]
In sum, we conclude that Greene has satisfied her initial burden of "rais[ing] a legitimate question of liability appropriate for judicial inquiry." G. L. c. 231, § 60B. Accordingly, we reverse the judgment of dismissal and remand this matter to the Superior Court where the determination of the tribunal is to be replaced with a determination that the plaintiff's offer of proof is sufficient to raise a legitimate question appropriate for judicial inquiry.
So ordered.

The claims were based on negligence, vicarious liability, and related theories.

General Laws c. 231, § 60B, the malpractice tribunal statute, applies broadly to "all treatment-related claims" involving a provider of health care. Vasa v. Compass Med., P.C., 456 Mass. 175, 177 (2010), quoting from Little v. Rosenthal, 376 Mass. 573, 576 (1978). See generally Jacobs & Laurence, Professional Malpractice §§ 5.1-5.7 (2017).

The current appeal is before us based on a separate and final judgment entered dismissing the plaintiff's claims against Dr. Elgeziry. See Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974). Harbor Medical Associates, P.C. (Harbor) remains a party to the underlying litigation. Given that Harbor's alleged liability is based entirely on Dr. Elgeziry's alleged negligence, the propriety of the judge's entry of a separate and final judgment lies in significant doubt. Nevertheless, in our discretion, we reach the merits, which have been fully briefed by both sides.

General Laws c. 231, § 60B, "requires a physician member on the tribunal so that he or she may lend expertise in medical matters and assist in screening out nonmeritorious claims." Blood, 403 Mass. at 435.

For example, on April 8, 2011, Abraham's complaints about chest congestion, wheezing, and difficulty breathing were paired with his complaints about abdominal bloating and diarrhea.

For example, during his visit to Dr. Elgeziry's office on June 3, 2011, Abraham presented complaints of shoulder pain and constant episodes of moderate fatigue, but he did not experience chest pain and denied chest tightness, and Dr. Elgeziry noted that, related to Abraham's heart condition, "the apical impulse was normal [and] heart rate and rhythm were normal."

We note one additional problem with the medical tribunal proceedings. Over the plaintiff's objection, Dr. Elgeziry's counsel improperly presented the tribunal with the results of her own research about the topical testosterone cream prescribed by Dr. Elgeziry and its effects on the risk of coronary artery disease. While she herself recognized that such material was outside the record, she nevertheless argued that the tribunal could "take that into account" when deciding the issue of causation.